

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-77,087

**DILLION GAGE COMPTON, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 011545
### IN THE 259TH DISTRICT COURT
### JONES COUNTY

SLAUGHTER, J., delivered the opinion of the Court in which HERVEY, RICHARDSON, YEARY, NEWELL, KEEL, and MCCLURE, JJ., joined. WALKER, J., filed a concurring opinion. KELLER, P.J., concurred.

### O P I N I O N

A jury convicted Appellant Dillion Gage Compton of capital murder. *See* TEX. PENAL CODE § 19.03(a)(5)(A). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. ART. 37.071, § 2(g).[1] Direct

---

[1] Unless otherwise indicated, all subsequent citations to "Articles" refer to the Texas Code of Criminal Procedure.

appeal to this Court is automatic. ART. 37.071, § 2(h).

Appellant raises eighteen points of error. Finding each of Appellant's points of error either meritless or not preserved, we affirm the trial court's judgment of conviction and sentence of death.

## FACTUAL BACKGROUND

In the early morning hours of July 16, 2016, the French Robertson Unit of the Texas Department of Criminal Justice ("TDCJ") was on lockdown. Most of the inmates were confined to their cells. But around twenty inmates, including Appellant, were working in the kitchen preparing meals. Four or five correctional officers, including Officer Mari Ann Johnson, the victim in this case, were supervising these kitchen workers.

At around one o'clock that morning, food service manager Officer Patrick Roach entered a secured dry-goods commissary to get some supplies. He was surprised when Appellant, who had no permission to be there, emerged from behind a desk in the corner. Roach asked him what he was doing there. Appellant answered, "Nothing." Roach told Appellant to leave and then left the room himself.

At two a.m., correctional officers conducted a "count" to ensure that all the inmates were accounted for. Roach and another supervisor noticed that Officer Johnson was missing. After completing the count, they went looking for her. Eventually, Roach found Johnson—pale, bruised, and unresponsive—in the commissary hidden behind a rolling cabinet. She was slumped against the wall, "kind of on her side," with her right arm pulled across her body and handcuffed to a pallet. Her pants and underwear were down around her knees and ankles, and her shirt and bra were pulled up, exposing her breasts. There was

an apparent strangulation mark around her neck. Roach then put out the alert: "Officer down." First responders and hospital workers tried to save Johnson, but such efforts were unsuccessful. She was pronounced dead at the hospital.

Meanwhile, officers directed Appellant and several other inmates to one of the "chow halls" near the prison's kitchen. Roach told another officer about his earlier encounter with Appellant in the dry-goods commissary. As a result, officers escorted Appellant out of the chow hall for questioning. One of the officers noticed red, fresh-looking scratches on Appellant's face and neck. When the officer asked Appellant about them, Appellant claimed he got them during a haircut.

Investigators questioned Appellant later that day about whether he had anything to do with Johnson's death. Appellant admitted that he had spoken with Johnson during his kitchen shift but denied being alone with her and insisted that he had done nothing wrong. The investigators also asked Appellant about the scratches on his neck. This time, Appellant said that he got them when he was being escorted from the chow hall. The investigators informed Appellant that they would be able to compare his DNA with any DNA found at the crime scene. Appellant insisted that he did not know anything about Johnson's murder.

A few days later, on July 19th, Appellant agreed to speak with investigators a second time. During this second interview, Appellant told the investigators that he and Johnson had been in a consensual sexual relationship for the past two years. He claimed that, during the lockdown on July 16th, he and Johnson had snuck into the dry-goods commissary to have sex. Roach almost caught them, Appellant said, which prompted an argument between

Johnson and himself. Johnson threatened Appellant with pepper spray. Appellant then put Johnson in a choke hold, hoping that she would "pass out," giving him a chance to leave. Appellant claimed he did not intend for Johnson to die and that, when he left the commissary, she was still breathing.

Forensic testing showed the following: Portions of the shirt and pants Appellant wore on the day of Johnson's murder tested presumptively positive for the presence of blood. DNA testing on those items generated DNA profiles from which Johnson could not be excluded as a possible contributor. A stain on Appellant's shirt tested presumptively positive for the presence of semen; DNA testing on that stain generated a profile consistent with Appellant's DNA. Appellant's boxer shorts tested presumptively negative for the presence of semen, as did a swab of Appellant's penis. However, DNA testing on Appellant's boxer shorts and penile swabs generated profiles from which Johnson could not be excluded as a possible contributor.

Portions of the shirt, bra, and pants Johnson was wearing at the time of her death tested presumptively positive for the presence of blood. DNA testing on some portions of Johnson's shirt and pants generated profiles from which Appellant could not be excluded as a possible contributor. Appellant was excluded as a possible contributor to the DNA profile on Johnson's bra, as that profile was "consistent with" Johnson's DNA. A portion of Johnson's pants tested positive for the presence of semen, as did a portion of her underwear and a swab of her vagina. DNA testing on the portions of Johnson's pants and underwear that tested positive for semen generated DNA profiles from which Appellant

was excluded as a possible contributor.[2] Appellant was similarly excluded as a possible contributor to the DNA mixture found on the swab of Johnson's vagina. But Appellant could not be excluded as a possible contributor to DNA mixtures found on Johnson's neck, temple, wrists, knuckle, right index finger, and thigh. Appellant also could not be excluded as a possible contributor to DNA mixtures found in clippings from Johnson's fingernails.

Johnson's autopsy revealed that she had suffered multiple injuries consistent with manual strangulation. These included petechiae around Johnson's face and neck and in her eyes and mouth, "extensive" bleeding in the soft tissue and muscles of her neck, and fractures in the bones and cartilage of her neck. The medical examiner who performed Johnson's autopsy testified that, in all her time as a medical examiner, she had encountered only one other neck so badly crushed—a case in which the victim's neck had been "stomp[ed]" on with a boot.

The medical examiner also found signs of blunt force trauma, including contusions and abrasions on Johnson's head, neck, torso, and extremities; rib and sternal fractures; and organ damage. Some of these injuries were consistent with defensive wounds. The medical examiner also observed an "L-shaped area of dense petechiae" on Johnson's temple, possibly indicating that her head had struck something L-shaped, like the corner of a desk. The medical examiner concluded that the cause of Johnson's death was "asphyxia due to manual strangulation with blunt force injuries," and that the manner of her death

[2] The DNA expert's report and testimony did not identify the contributor. Because Appellant's points of error do not relate to the unidentified contributor, this issue is not germane to our review.

was homicide.

At the punishment phase of trial, the State presented evidence that, in 2011, Appellant pleaded guilty to aggravated sexual assault of a child. At the time of the offense, Appellant was sixteen years old but had been certified to stand trial as an adult. He received a twenty-five-year sentence. While serving that sentence, Appellant committed the instant capital murder. The State also introduced evidence of the prior sexual assault itself, which showed that Appellant had forcibly sexually assaulted a ten-year-old girl. The State presented evidence suggesting that Appellant was planning to sexually assault another young girl the day after he sexually assaulted the ten-year-old.

The State also adduced evidence of Appellant's behavior while incarcerated. A guard at the Taylor County Jail, where Appellant was housed during the trial in this case, testified that Appellant had threatened to fight him over a scheduling misunderstanding. A former prison guard testified that, in July 2013, Appellant threatened her in the Robertson Unit kitchen, telling her, "I got 25 years. I don't have anything to lose."

Appellant focused his punishment case on the mitigation special issue. One focus of Appellant's mitigation case was that Appellant, the son of a black man and a white woman, was scorned and abused by his openly racist grandfather. Another mitigation focus was that Appellant's mother, a drug-addicted prostitute, put him in situations that were unsuitable and unsafe for children, resulting in him suffering abuse and neglect. A third focus was that Appellant was a deeply religious person who had shown contrition for his misdeeds.

**ANALYSIS**

Appellant challenges his conviction and death sentence in eighteen points of error. These points of error can be grouped into five categories: Voir Dire Claims (points of error one and six through nine); Claims of Jury Charge Error (points of error ten and eleven); Claims of Trial Court Error During the Punishment Phase (points of error twelve, thirteen, sixteen, and seventeen); Punishment Phase Jury Argument Claims (points of error two through five, fourteen, and fifteen); and a Catchall Due Process Claim Based on the State's Cumulative Misconduct (point of error eighteen). We address and reject each of Appellant's claims below.

## I.      Voir Dire Claims (Points of Error One, Six, Seven, Eight, and Nine)

In point of error one, Appellant broadly alleges that the State sought white, male venirepersons for the jury and exercised its peremptory strikes against women and racial minorities in a discriminatory manner to accomplish that goal. In point of error six, Appellant challenges the for-cause dismissal of a venireperson who admitted in individual voir dire that she could not assess the death penalty against Appellant because of his youth. In points of error seven and eight, Appellant contends that the State violated the Eighth Amendment and due process when, in individual voir dire, it made a series of comments arguably suggesting that the victim's family wanted Appellant to receive a death sentence. In point of error nine, Appellant raises a complaint related to points of error seven and eight arguing that trial counsel's failure to object to the State's comments in voir dire deprived him of his Sixth Amendment right to the effective assistance of counsel.

### A.      We overrule point of error one because the trial court did not clearly err in concluding that the State's peremptory strikes were not motivated by discriminatory intent.

In point of error one, Appellant claims that the State discriminated against non-white venirepersons and female venirepersons in its use of peremptory strikes, in violation of the Fourteenth Amendment to the United States Constitution. *See Batson v. Kentucky*, 476 U.S. 79 (1986) (forbidding race-based peremptory strikes); *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (forbidding gender-based peremptory strikes).

Resolving a claim that the prosecution exercised a peremptory strike based on race or gender involves a three-step process:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race [or gender]; second, if that showing has been made, the prosecution must offer a race-neutral [or gender-neutral] basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008) (internal quotation marks and brackets omitted); *see Guzman v. State*, 85 S.W.3d 242, 245–46 (Tex. Crim. App. 2002) (applying the same analysis to allegations of gender-based discrimination).

In evaluating purposeful discrimination, a court inquires as to whether "the prosecutor's stated reasons were the actual reasons or instead were a pretext for discrimination." *Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019). At the trial level, such a determination requires the judge to evaluate the prosecutor's credibility and demeanor. *Id.* at 2243–44. "These determinations of credibility and demeanor 'lie peculiarly within a trial judge's province.'" *Id.* at 2244 (quoting *Snyder*, 552 U.S. at 477). On appeal, "'a reviewing court ordinarily should give those findings great deference.'" *Id.* (quoting *Batson*, 476 U.S. at 98 n.21). Accordingly, a trial judge's ruling on the third step

must be upheld on appeal unless it was "clearly erroneous." *Snyder*, 552 U.S. at 477.

In reviewing for clear error on appeal, we consider the entire voir dire record. *Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013). We are not limited to arguments or considerations that the parties called to the trial judge's attention, so long as the arguments or considerations are grounded in the appellate record. *Id.* Factors we may consider include: (1) statistical evidence, (2) evidence of disparate questioning of similarly-situated venirepersons, (3) side-by-side comparisons of the stricken venirepersons and the accepted venirepersons, (4) whether the record supports the State's explanations for its strikes, and (5) any other relevant circumstances bearing on the issue of purposeful discrimination. *Flowers*, 139 S. Ct. at 2243.

Ultimately, purposeful discrimination is shown when all the "relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike[s] . . . [were] not 'motivated in substantial part by discriminatory intent.'" *Id.* at 2235 (quoting *Foster v. Chatman*, 578 U.S. 488, 512–13 (2016)). Even a single discriminatory strike is sufficient to sustain a challenge under *Batson* or *J.E.B*. *Id.* at 2244 ("The Constitution forbids striking even a single prospective juror for a discriminatory purpose.").

After strikes for cause, the voir dire process in this case produced 42 qualified venirepersons for the 12-person jury.[3] Of the 42 qualified venirepersons, 19 were men and

---

[3] There were also four venirepersons qualified to serve as alternates. All four were white women. Each side was given one strike in this group of four.

23 were women. As for race, the precise breakdown is uncertain because Venireperson 1 listed his race as "I lost," and Venireperson 32 listed his race as "n/a." But other than those two, four were racial minorities (two blacks and two Hispanics[4]) and 38 were white. Of the male venirepersons, three self-identified as minorities. Of the female venirepersons, only one self-identified as a minority. Each side was initially given fifteen peremptory strikes, though Appellant would later ask for and receive a sixteenth. The parties submitted their strike lists to the trial judge simultaneously. After the court read the strikes into the record, the twelve-person jury was composed of four women and eight men. The racial makeup of the jury was one minority (a Hispanic man), and 11 whites.

The trial judge asked the parties if they had any "issue[s]" with the jury. Appellant first objected under *Batson*, noting that the State struck a Hispanic man (Venireperson 6) and two black venirepersons—one female (Venireperson 5) and one male (Venireperson 7)—comprising "the only . . . black jurors on the entire panel." Appellant also objected under *J.E.B.*, noting that the State exercised thirteen of its fifteen strikes against women. Finally, Appellant observed that, of the only two men the State struck, one of them (Venireperson 6) was Hispanic and the other (Venireperson 7) was black.

In response to Appellant's *Batson* and *J.E.B.* objections, the State explained that it struck these venirepersons not because of their race or gender but because they indicated they could not follow the law. Namely, according to the State, their responses suggested that they had significant moral reservations about imposing the death penalty and would

---

[4] One listed his race as "Hispanic/Native American."

have difficulty assessing that punishment even if the facts and law supported it. The trial court overruled Appellant's objections.

On appeal, Appellant makes five broad arguments to support his claim that the State improperly favored white male venirepersons in this case:

- The pattern of the State's strikes resulting in the elimination of thirteen women and three racial minorities "creates an inference of discrimination;"
- The State's race- and gender-neutral reasons for its strikes are mere pretext because its reasons are contradicted by the record;
- The State accepted white male venirepersons who expressed views on the death penalty comparable to, and in some cases even less favorable to the State than, those of the minority and women venirepersons it struck, thereby indicating pretext;
- The State engaged in disparate questioning designed to encourage non-white male venirepersons to express hesitation about the death penalty; and,
- With respect to the *J.E.B.* claim, the record does not support the State's assertion that the panel was disproportionately female.

Viewed collectively, Appellant urges that these considerations demonstrate that the State impermissibly struck potential jurors because of their race and/or gender and that its purported race- and gender-neutral explanations for the strikes were pretextual.

Appellant has shown that the State struck mostly minority and women prospective jurors. The prosecution offered race- and gender-neutral reasons for the strikes. Therefore, we must assess whether, under the totality of the record, the trial judge committed clear error by finding no pretext and overruling Appellant's *Batson* and *J.E.B.* objections. As shown below, we conclude that the responses given by the stricken venirepersons demonstrated a greater level of hesitation, vacillation, or opposition to the death penalty

(either generally or as it may be applied to the facts of this case) than those responses given by the unstricken venirepersons. Thus, the record supports the State's nondiscriminatory reasons for exercising its peremptory strikes. Accordingly, the trial court did not clearly err in rejecting Appellant's *Batson* and *J.E.B.* challenges.

### 1. Appellant's *Batson* challenge lacks merit.

Appellant alleges that the State's reasons for striking three racial minorities, Venirepersons 5, 6, and 7—the only two black venirepersons and a Hispanic venireperson—were belied by the record. We will first examine the stricken racial minorities' voir dire responses and the State's proffered reasons for striking them. We will then address Appellant's arguments under the five *Flowers* factors. *See* 139 S. Ct. at 2243.

**Venireperson 5**

In Venireperson 5's juror questionnaire, she rated her support for the death penalty as a three out of six. She indicated that she is "generally opposed to the death penalty, except in a few cases where it may be appropriate." She disagreed with the statements, "Capital punishment may be wrong, but it is the best preventative for crime;" "Capital punishment is absolutely justified;" and "Capital punishment is wrong, but it is necessary in our imperfect civilization." She also, however, gave some answers expressing modest support for the death penalty. For example, she agreed with the statements, "We must have capital punishment for some crimes" and "Capital punishment is just and necessary."

Venireperson 5's responses indicating support for the death penalty were later tempered by her statements during individual voir dire. Such statements included that she "didn't really like" the death penalty, and that if she were "queen of Texas," she would not

have the death penalty. She also admitted that she had "pretty strong feelings against the death penalty." But she then wavered by stating that she was "indifferent" and was not "really for or against" the death penalty and could follow the law.

When asked about the life-without-parole option, she expressed strong support for it, broadly stating that "giving the death penalty is the easy way out and they [the defendant] should have to live with the fact of what they did." She also indicated that she would afford substantial weight to potentially mitigating circumstances such as a difficult upbringing or a defendant's youth—both of which were mitigation issues present in this case.

Venireperson 5 also suggested that she might require the State to prove that the murder was premeditated before she would consider imposing the death penalty. Specifically, after the prosecutor clarified that the law did not require proof of premeditation to render a person eligible for the death penalty, he asked Venireperson 5 to elaborate on her statement that she could impose the death penalty "as long as there is enough evidence." Venireperson 5 replied, "If the evidence proves that the person committed the crime intentionally or if it was premeditated—well, no, not premeditated, but that just like you said, if they know—knowingly, if they knew that they were going to kill that—kill the victim. If they had it planned in their mind."

After Venireperson 5's individual voir dire, the State moved to strike Venireperson 5 for cause, arguing that she could not fairly consider the death penalty and that her answers were equivocating. The trial court denied the State's motion. The State later used one of its peremptory strikes to remove Venireperson 5, which the defense challenged as violating *Batson*. In response, during discussions on the *Batson* challenge, the State pointed out that

Venireperson 5 "was going to require us to show that in order for the death penalty to be on the table that the murder was premeditated," suggesting that she would hold the State to a higher burden by requiring a heightened level of *mens rea* not required by the Penal Code. The State also noted that Venireperson 5 was "all over the map" in terms of her vacillation on the issue of the death penalty.

In his brief on direct appeal, Appellant argues that the record undermines the State's claim that Venireperson 5 would have required evidence of premeditation for the death penalty to be "on the table." Appellant points to Venireperson 5's statement that, by *premeditation*, she meant only that she wanted some assurance that the underlying murder was committed *knowingly*—thus making her an unobjectionable venireperson. But Venireperson 5's complete statement—particularly, the portion indicating, even after she had received clarification on the law, that she would require proof that the defendant had the murder "planned in their mind"—would have left the State uncertain regarding her true feelings on the topic of premeditation. Given the ambiguity of Venireperson 5's complete statement, the State's explanation was not undermined by the record.

Moreover, the point of a *Batson* inquiry is not to test the accuracy of the prosecutor's recollection of a venireperson's statements. Instead, it is to test the genuineness of the prosecutor's explanation based on his or her perception of a venireperson's responses. *See Flowers*, 139 S. Ct. at 2250 (observing that "prosecutors can make mistakes when providing explanations," and "mistaken explanations should not be confused with racial discrimination;" but "when considered with other evidence of discrimination, a series of factually inaccurate explanations for striking black prospective jurors can be telling").

Thus, even if the prosecutor's summary of Venireperson 5's statement was mildly inaccurate, we would not regard that alone as constituting compelling evidence of racial discrimination. We must instead view it in context and consider it holistically with the other evidence.

As noted, the State did not rely solely on Venireperson 5's statement regarding premeditation when explaining the strike. The State also pointed to her vacillating and equivocating answers regarding whether she was supportive of the death penalty, noting specifically that "if [she] were the queen of Texas, she would say she would not have a death penalty." Overall, the State argued that Venireperson 5 "had a very difficult time with the death penalty."

**Venireperson 6**

Appellant argued that the State impermissibly struck Venireperson 6, a Hispanic man, based on his race. The State responded that Venireperson 6's answers indicated that he could not consider imposing the death penalty. The record reveals that Venireperson 6 vacillated and gave conflicting responses regarding his feelings about the death penalty.

In his written questionnaire, Venireperson 6 rated his support for the death penalty as a four out of six and initially indicated that he was in favor of capital punishment.[5] But then, in individual voir dire, he acknowledged that he was "on the fence" about the death

---

[5] Many of his questionnaire responses indicated support for the death penalty. He agreed with the statements: "Capital punishment is absolutely justified;" "We must have capital punishment for some crimes;" and "Capital punishment is just and necessary." But he also expressed consistent support for the life-without-parole option, agreeing that "[a] sentence of life imprisonment without parole IS enough punishment for a person convicted of capital murder," and disagreeing that life without parole is "wasteful to society."

penalty. Nevertheless, he represented that his personal beliefs would not impede his ability to impose that punishment if it was warranted. The prosecutor then noted that, according to the juror questionnaire, Venireperson 6 was Catholic. The prosecutor asked whether the Pope's opposition to the death penalty would affect his views. Venireperson 6 responded, "You got a point. I don't know." When pressed further on this topic, Venireperson 6 replied, "I guess I should have looked into it, but I didn't, so . . . You're probably right, if they're [the Catholic church] against [the death penalty] then I'd probably be against it." Venireperson 6 then agreed with the prosecutor that this probably wasn't the "right jury" for him to sit on. But later, upon further questioning, Venireperson 6 reaffirmed that he could "separate what [he] believe[s] as a Catholic" and vote for the death penalty if warranted by the evidence. Venireperson 6's vacillation regarding whether he could impose the death penalty and his agreement that this probably was not the "right jury" for him to sit on provided a high level of uncertainty for the State regarding Venireperson 6's true feelings about the death penalty.

## Venireperson 7

Appellant also challenges the State's use of a peremptory strike against Venireperson 7, a black man. The State claims to have struck him not because of his race but instead based on what it perceived to be religious scruples against the death penalty. Although Venireperson 7 did not expressly state that his religion prevented him from imposing the death penalty, his responses collectively showed that he held an abiding moral or possibly religious belief that life is precious. Even the trial judge's impression on the record was that Venireperson 7 had strong religious beliefs that might have impeded his

ability to consider the death penalty.[6]

In Venireperson 7's questionnaire, he rated his support for the death penalty as a two out of six. He self-identified as a Baptist who regularly attends religious services, and when asked to name a person he admired, he listed a church pastor. In addition, his written responses indicated that he did not "believe in killing anyone," but it "depends on the crime." He stated that the crime would have to be "really bad" to justify the death penalty. He also disagreed with the statements, "Capital punishment is just and necessary" and "Capital punishment gives the criminal what they deserve."

In individual voir dire, Venireperson 7 explained, "Just because somebody does something wrong . . . I don't feel like it's right to kill that person because they killed somebody else." He also stated that, if he were in charge of Texas, he would not have the death penalty because he did not "feel like it's right to just kill that person because they killed someone else." However, he indicated that he could consider the death penalty for a person who had "taken a life" while "locked up," stating, "You wonder if they're locked up again are they going to have that chance to take another life, and I wouldn't want to put a person in that situation to take another life, you know?"

Although Venireperson 7 ultimately affirmed that he could honestly answer the special issues if chosen for the jury, he did equivocate at times, agreeing with the prosecutor

---

[6] Specifically, during the *Batson* challenge, the trial judge stated, "I would like the record to reflect just from the Court's notes that there was a State's challenge on [Venireperson 5], [and] a State's challenge on [Venireperson 7]. My notes reflect that the State's challenge on . . . [Venireperson 7] ultimately towards the end of his interview reflected that he had religious concerns with being able to consider the death penalty."

at one point that his personal feelings were going to "weigh so heavy on [his] heart" that it would impair his ability to vote in favor of the death penalty. During questioning by defense counsel, Venireperson 7 also indicated that he would assign significant weight to mitigation evidence, such as the defendant's "background, his history, and what he's going through." By the end of individual questioning, he stated that he did not "think the death penalty was wrong" and could fairly consider that sentencing option. Overall, Venireperson 7 indicated a high level of discomfort with imposing the death penalty and further expressed that he would afford great weight to mitigating factors.

While the aforementioned statements do support the State's proffered reasons for striking these minority venirepersons, we must examine the record under the *Flowers* factors to determine if the State's reasons were mere pretext. In doing so, we examine whether the "relevant facts and circumstances taken together establish that the trial court committed clear error in concluding that the State's peremptory strike[s] . . . [were] not 'motivated in substantial part by discriminatory intent.'" *Flowers*, 139 S. Ct. at 2235 (quoting *Foster*, 578 U.S. at 512–13 (2016)).

### a. The statistical evidence alone does not prove purposeful discrimination.

Regarding the first factor, we consider the statistical evidence. Appellant notes that the State used three of its fifteen peremptory strikes against non-white venirepersons, leaving only one non-white venireperson on the panel.[7] The fact that the State struck three

---

[7] As indicated, the panel also included two venirepersons who did not self-identify as a particular race. Thus, the race of these individuals is unknown. Therefore, there could have been more than

(Continued . . .)

of the only four minorities on the qualified venire panel satisfies Appellant's prima facie case under *Batson*. A pattern of strikes against a protected group "'might give rise to an inference of discrimination.'" *Flowers*, 139 S. Ct. at 2246 (quoting *Batson*, 476 U.S. at 97). But statistical evidence alone cannot prove purposeful discrimination. *Watkins v. State*, 245 S.W.3d 444, 452 (Tex. Crim. App. 2008). Instead, we look to "all relevant factors" coupled with this statistical evidence in deciding whether the trial judge's ruling was clearly erroneous. *Id.*

### b. There is no evidence of racially-motivated disparate questioning.

Appellant argues that the State engaged in disparate questioning designed to encourage the non-white venirepersons to express hesitation about the death penalty. He elaborates that, when it came to non-white venirepersons, the State was likelier to:

(a) emphasize Appellant's humanity (by reciting what Appellant calls a "humanity script," *cf. Miller-El v. Dretke*, 545 U.S. 231, 255 (2005))[8];

(b) ask about the venireperson's religious beliefs and role models; and

(c) ask whether the venireperson's feelings about the death penalty would "substantially impair" his or her ability to sit as a juror in this case.

---

one minority left on the panel after the State exercised its peremptory strikes. But for purposes of this opinion, we will assume Appellant is correct that only one minority remained.

[8] In *Miller-El*, during individual questioning of certain prospective jurors, the State had provided graphic descriptions of how the death penalty was imposed by lethal injection, purportedly in an effort to root out ambivalence or hesitancy about the death penalty. 545 U.S. at 255–60. Statistically, the State was far more likely to use this "script" on non-white prospective jurors. *Id.* at 256–57. The Supreme Court ultimately found this disparity to be compelling evidence of racial discrimination under the facts of that case. *Id.* at 260. Here, Appellant's description of a "humanity script" points more to the State's questioning emphasizing Appellant as a person (e.g., that he is a man who eats, sleeps, has a family, and has feelings, etc.) when asking prospective jurors if they would have moral reservations about imposing the death penalty given Appellant's humanity.

Disparate questioning of prospective jurors "can be probative of discriminatory intent." *Flowers,* 139 S. Ct. at 2247 (finding persuasive evidence of discriminatory intent where the State asked the black prospective jurors many more questions than seated white jurors); *see also Miller-El v. Cockrell*, 537 U.S. 322, 344 (2005) ("If the use of disparate questioning is determined by race at the outset, it is likely [that] a justification for a strike based on the resulting divergent views would be pretextual."). But when examining the record here, any disparity in the State's questioning appears to be based solely upon the venirepersons' responses regarding their opinions, feelings, and beliefs about the death penalty, life imprisonment, and mitigating circumstances. Thus, any such disparity seems to have been motivated by the State's justifiable desire to follow up on potentially unfavorable questionnaire responses or answers provided during individual questioning that suggested the person harbored reservations about imposing the death penalty, either generally or given the facts of this case. In fact, the more hesitation any venireperson showed regarding the imposition of the death penalty, the more rigorously the State questioned them, regardless of race.

One such example highlighted by Appellant is a comparison of the State's questioning of Venirepersons 5 and 80. While the State asked Venireperson 5 more questions in individual voir dire than it asked Venireperson 80, there were notable differences in their respective questionnaire responses which demonstrated a nondiscriminatory reason for such questioning disparity:

- Venireperson 5 said that the criminal laws of the United States and Texas are too harsh, while Venireperson 80 said they were too lenient.

- Venireperson 5 answered that she is "opposed to capital punishment, except in a few cases where it may be appropriate," whereas Venireperson 80 said that he was neither opposed to nor in favor of the death penalty.

- On a scale of one-to-six, one being opposed to and six being in support of the death penalty, Venireperson 5 rated herself a three and Venireperson 80 rated himself a six.

- Venireperson 5 indicated that she believed life imprisonment without parole is more effective than the death penalty, and she disagreed that life imprisonment without parole is *not* enough punishment for capital murder, but Venireperson 80 disagreed with the former and agreed with the latter.

Further, some of Venireperson 5's individual voir dire responses could have reasonably prompted the prosecution to inquire further into her feelings about the death penalty, while Venireperson 80's voir dire responses were more favorable regarding his ability to consider capital punishment. One of the first questions the prosecutor asked Venireperson 5 was how she felt about serving on a jury in a death penalty case. In response to the question, the State noted on the record that Venireperson 5 grimaced. The prosecutor then noted that her questionnaire responses led him to believe she "didn't really like the death penalty," to which Venireperson 5 responded, "No. No I don't." He then asked her whether, in a hypothetical world where she was the queen of Texas, she would have the death penalty as a possible punishment. Venireperson 5 responded that she would not.

By contrast, when Venireperson 80 expressed some hesitation about the death penalty, the prosecutor told him, "If you don't think you can do it, let us know." In response, Venireperson 80 said, "I think that some crimes, you know, are—you know, demand the death penalty. . . . And I think that, you know, if the evidence is there and overwhelming and everything, I think I could vote the death penalty, you know." After

additional questioning, Venireperson 80 told the prosecutor that he could set aside any personal feelings, evaluate the evidence, and consider the full range of punishment.

Given the circumstances, and in view of the entire record, the State had a valid, race-neutral purpose in asking Venireperson 5 more (and more probing) follow-up questions about her feelings and beliefs related to the death penalty as compared to the questioning of the white venirepersons. Based on our review of the complete voir dire record, the same is also true with respect to any arguably disparate questioning of Venirepersons 6 and 7. *See Flowers*, 139 S. Ct. at 2247 ("It is certainly reasonable for the State to ask follow-up questions . . . . The disparate questioning or investigation of black and white prospective jurors may reflect ordinary race-neutral considerations."). The record reflects that the State followed up with additional questioning for the prospective jurors who expressed hesitancy or reservations about imposing the death penalty, or who indicated that they would place significant weight on mitigating factors. Such additional questioning, without more, does not create an inference of racial discrimination.

> c. **Side-by-side comparisons of stricken and accepted venirepersons support the State's nondiscriminatory reason for its peremptory strikes.**

Appellant contends that the State accepted white male venirepersons who also expressed serious personal or moral reservations about imposing a death sentence. Thus, he contends, a comparative analysis of the non-white jurors the State struck and the white male jurors it accepted reveals that the State's proffered reasons for the strikes were pretextual. *See Flowers*, 139 S. Ct. at 2248–49 ("Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation

occurred;" when a prosecutor's "'proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack panelist who is permitted to serve, that is evidence tending to prove purposeful discrimination.'") (quoting *Foster*, 578 U.S. at 512) (internal citations omitted).

Specifically, Appellant points to three white male venirepersons who were accepted by the State in spite of their expressed personal moral reservations about the death penalty: Venireperson 47, who indicated in his questionnaire that he was "very conflicted" about capital punishment; Venireperson 68, who compared the death penalty to abortion and stated that that it was "fine for other people, but for myself I would choose not to;" and Venireperson 80, who stated in individual voir dire that he "didn't really know" whether he could impose a death sentence because he did not want to tell his grandchildren that he "helped put somebody to death."

When examining the questionnaires and voir dire responses of Venirepersons 47, 68, and 80,[9] whom the State did not strike, it becomes apparent that the State had some certainty these venirepersons would be generally supportive of imposing the death penalty under the facts of this case. The same could not be said when examining the responses of Venirepersons 5, 6, and 7.

**Venireperson 47**

---

[9] In this opinion, we discuss these three venirepersons because Appellant points to them as evidence of racially motivated strikes against similarly-situated prospective jurors. But we also examined the record for the responses given by the other white venirepersons not struck by the State and found no evidence that the State failed to strike white venirepersons who gave responses equally unfavorable to the stricken minority venirepersons.

As Appellant suggests, Venireperson 47 expressed reservations about the death penalty in his questionnaire. For example, he agreed with the statements, "I am opposed to capital punishment except in a few cases where it may be appropriate," and "Execution of criminals is a disgrace to a civilized society." But in other instances, he expressed support for capital punishment. He ranked his support for the death penalty as a 4.5 out of 6 and agreed with the statements, "Capital punishment is wrong, but it is necessary in an imperfect society;" "We must have capital punishment for some crimes;" and "Capital punishment gives the criminal what they deserve." Based on these questionnaire answers, in individual voir dire, the State asked Venireperson 47 several questions about the death penalty to further probe his questionnaire responses.

In response to the State's questioning, Venireperson 47 explained that he wavered on the death penalty specifically because he "would rather see a guilty man walk free than an innocent man executed." Regarding the option of life without parole, he stated that it might be "a little harsher or a little more appropriate" in some cases because death was "too easy" for some people. But his additional answers indicated that he would consider the life-without-parole option only in cases where the individual would not be a future danger if incarcerated. He clarified that he was not morally opposed to the death penalty as a general matter, nor was he uncomfortable imposing that penalty in an appropriate case, but instead he believed that life without parole may be a more appropriate punishment on a case-by-case basis.

Additionally, in both his questionnaire responses and during individual voir dire, Venireperson 47 consistently indicated that he would not assign significant weight to

evidence of a defendant's troubled background, difficult childhood, or similar mitigating circumstances. In his questionnaire, he described "childhood and background" evidence as having only "flimsy" relevance to sentencing. In voir dire, he stated that it would be a "tall order" for him to give meaningful consideration to "background and character" evidence in the punishment phase. In fact, when asked about his ability to consider a person's difficult childhood as mitigating evidence, Venireperson 47 stated, "If a person knows the difference between right and wrong, and, yet, still commits that type of crime, I'm not real sure that background and that type of thing really has as much weight . . . I mean, right and wrong is right and wrong."

Viewing Venireperson 47's responses collectively and in comparison to those of the minority venirepersons struck by the State, the State could rationally conclude that Venireperson 47 viewed the death penalty much more favorably than did Venirepersons 5, 6, and 7. Defense counsel apparently reached the same conclusion about Venireperson 47, because they used one of their peremptory strikes on him.

### Venirepersons 68 and 80

Appellant also points to the record regarding Venirepersons 68 and 80, both white men, as evidence that the State accepted white male venirepersons who gave unfavorable responses about the death penalty. However, we disagree with Appellant's characterization of the record. Overall, both men expressed largely positive views of capital punishment. On their questionnaires, they ranked themselves five-out-of-six and six-out-of-six, respectively, in favor of the death penalty. Both disagreed with the proposition, "Life imprisonment without parole is more effective than capital punishment." Both disagreed

with the proposition, "A sentence of life imprisonment without parole IS enough punishment for a person convicted of Capital Murder."

With respect to Venireperson 68, in his questionnaire responses, he agreed with several statements favorable to the death penalty, including: "Capital punishment is absolutely justified;" "We must have capital punishment for some crimes;" and "Capital punishment is wrong, but it is necessary in our imperfect civilization." He stated that he would be in favor of the death penalty for a person guilty of killing a correctional officer and that the death penalty is important as an "ultimate deterrent." Though he made several statements qualifying his support for capital punishment, including that he "worr[ies] about wrongful convictions" and that "sometimes mitigating circumstances would make life in prison a better option," the prosecution could have reasonably determined that these statements were outweighed by his other responses that were favorable to the death penalty. Further, though he made a passing comment comparing the death penalty to abortion and stated, "It's fine for other people, but for myself I would choose not to," he immediately followed this up by stating, "But I'm not going to impose my views on someone else like that." Given the ambiguity of these statements, and viewing them in the context of Venireperson 68's other responses, failing to strike Venireperson 68 does not constitute compelling evidence of racial discrimination.

Turning to Venireperson 80, he indicated in his questionnaire responses that he believes criminal laws are "too lenient" (as opposed to too harsh) and that the death penalty is appropriate if the "crime is bad enough." He agreed with the statements "The death penalty is absolutely justified;" "Capital punishment is just and necessary;" and "Capital

punishment gives the criminal what they deserve." He also stated, "I think anyone who kills for no reason should be subject to [the] death penalty." During individual voir dire, he initially expressed some hesitation about his ability to consider the death penalty, stating that it would be a "hard decision to put . . . somebody's life on the line" and that he "didn't really know" whether he could do it. But, upon further questioning, he confirmed that if the "evidence were overwhelming," he could vote for the death penalty. He then further stated that some crimes "demand the death penalty."

Without engaging in an exhaustive side-by-side comparison, it is clear from the foregoing summary of the record that Venirepersons 47, 68, and 80 gave responses that were overall far more favorable to the State's preferred punishment as compared to the responses given by Venirepersons 5, 6, and 7. Despite Venirepersons 47, 68, and 80 expressing some doubts or hesitancy about the death penalty, such statements were fleeting, were overshadowed by other more death-penalty-favorable statements, or would not have been particularly concerning to the State given the particular facts of this case. Therefore, the record does not support Appellant's contention that the State accepted white venirepersons who expressed the same level of personal reservations about the death penalty as the non-white venirepersons it struck.

### d.     The record supports the State's explanations for its strikes.

The fourth *Flowers* factor—whether the record supports the State's explanations for its strikes—also weighs against a finding of clear error here. In providing the reason for its peremptory strikes, the State consistently stated that it struck venirepersons who indicated

they may be unable or unwilling to consider the full range of punishment—namely, the death penalty. The majority of the State's voir dire questioning for each venireperson focused on his or her feelings, thoughts, and opinions relating to the death penalty; the death-penalty versus life-without-parole option; and the importance of mitigating factors in deciding the special issues. Looking at the responses given by the State-stricken venirepersons versus those the State did not strike, each stricken venireperson, regardless of race, indicated a greater level of discomfort with being asked to impose the death penalty, or indicated that he or she would give significant weight to mitigating factors present in this case. Thus, the record supports the State's explanation that it "focused almost single-hand[ed]ly on the issue of the death penalty" in choosing whom to strike.

      **e.**      **None of the other circumstances raised by Appellant demonstrates purposeful discrimination.**

We now turn to the fifth *Flowers* factor—any other relevant circumstances bearing on the issue of purposeful discrimination. With respect to this factor, Appellant points to: (1) the trial court's rejection of the State's for-cause challenges to Venirepersons 5 and 7; and (2) the State's failure to challenge Venireperson 6 for cause. Based on our review of the entire record, neither of these circumstances, individually or collectively, demonstrates purposeful discrimination by the State.

Before exercising its peremptory strikes, the State challenged Venirepersons 5 and 7 for cause, arguing that they could not consider the death penalty as a possible sentence. For the challenge to Venireperson 5, the State provided the following basis for its position:

I believe that she cannot fairly consider the death penalty. When I asked her,

you know, "Would you want to be on a jury of a loved one that you lost," and she paused and said, "No," and agreed she did not want to be on this jury. And I'd also point out that in her questionnaire she indicated, no, that she did not want to be on this jury. She does keep kind of saying that she would consider it but all of her answers equivocate back to she would go – she would go with life without parole . . . .

The trial court acknowledged that Venireperson 5's demeanor was "all over the map," but it ultimately denied the State's challenge for cause, presumably because her hesitation did not rise to the level of refusing to follow the law.

Similarly, the State challenged Venireperson 7 for cause, arguing:

The State is going to make a motion to strike this juror for cause based on the fact that he did testify a couple of times that the fact that his belief that taking a life is wrong would weigh so heavily on him that it would substantially impair his ability to vote for the death penalty even though he could consider it . . . And he told me very specifically the first time I was questioning him, Judge, that it was something that was so strong in his belief system that in spite of what we might put on he would not be able to vote the death penalty, that it would impair him. Even though he came back . . . and said, yes, he could consider it. He still was very, very strong in that first time to say, yes, it would impair his ability to vote the death penalty in this case.
…
And so our problem is this: He changed his statement on that stand in the matter of the past 30, 40 minutes. What's he going to do when he's in that jury box? He's already shown both sides. Yes, at one point in time he said he could consider it but then he was also very clear that it was going to [weigh] too heavily on him to be able to vote the death penalty.
…

The trial judge ultimately overruled the State's challenge for cause to Venireperson 7.

Based on the trial court's rejection of its challenges for cause, the State then used peremptory strikes against these venirepersons. When Appellant later challenged these strikes under *Batson*, the State explained, consistent with its arguments used in seeking to strike these venirepersons for cause, that it struck them out of concern that they could not

follow the law by considering the full range of punishment—namely, that they could not consider imposing the death penalty. As for Venireperson 6, the State did not seek to strike him for cause. Appellant argues that the trial judge, by refusing to strike Venirepersons 5 and 7 for cause, found that these venirepersons could in fact consider the full range of punishment. And, because the trial judge made such a finding, the State's explanation for exercising its peremptory strikes on these two venirepersons must be pretextual. Appellant further claims that the State's failure to move to strike Venireperson 6 for cause on the basis that he could not consider the full range of punishment demonstrates that the State believed Venireperson 6 could, in fact, consider the full range of punishment. Therefore, Appellant concludes, the State's explanation for using a peremptory strike on Venireperson 6 was pretextual.

We do not construe the State's inability-to-consider-the-full-range-of-punishment explanation for its strikes as strictly as Appellant does. Specifically, we do not understand the State to have argued that Venirepersons 5, 6, and 7 were literally incapable of following the law. When Appellant pressed back against the State's explanation as to Venirepersons 5 and 7, the State was able to further clarify the basis for the strikes:

> [T]he State is obviously entitled to jurors that can follow the law in this case. Every strike we made was based on the fact essentially that these individuals could not consider the full range of punishment with respect to both . . . [Venireperson 5] and [Venireperson 7] both had a very difficult time with the death penalty, and I think the record's clear and the Court will remember in both of those cases we actually made a strike for cause. At one point both said that they could not—did not believe that they could impose the death penalty in this case. At the very least they were—they equivocated quite a bit on their answers.
> …
> [Venireperson 7] had also indicated, according to our notes, that his—he had

some religious scruples against the death penalty, and I believe he even used the magic words that it would substantially impair his ability to fairly consider the death penalty in this case.

…

On [Venireperson 5] I did ask the question, if you were queen of Texas, she would say she would not have a death penalty and she was going to require us to show that in order for the death penalty to be on the table that the murder was premediated. Even Ms. Henley noted in our argument on that strike for cause that she even agreed that this particular juror was all over the map.

…

And as to [Venireperson 7], you know, he said that the situation would have to be really bad to deserve the death penalty. How an individual was killed. But also said—you know, I asked the question would this not be a jury for him. He said, yes, it would weigh too heavily on his heart. Again he said he's not for taking a life.

 Appellant attempts to characterize these arguments as the State's "shifting explanations" for its strikes. *See Foster*, 578 U.S. at 512 (citing the State's "shifting explanations" for its strikes as one factor constituting circumstantial evidence "bear[ing] upon the issue of racial animosity"). But the State's clarification, consistent with the initial explanation, centered on the venirepersons' general attitudes toward the death penalty, rather than an absolute refusal or inability to consider that punishment. Thus, viewing this portion of the record in context, the State's explanations did not materially change during the course of the *Batson* hearing. Accordingly, the trial judge's rulings on the State's challenges for cause to Venirepersons 5 and 7, or the fact that the State did not challenge Venireperson 6 for cause, do not show that the State's explanation for the strikes was pretextual.

 In sum, taking each of the preceding arguments into account, individually and cumulatively, the trial judge did not clearly err to overrule Appellant's *Batson* objection. The totality of the record supports the genuineness of the State's explanation that it struck

prospective jurors based on their perceived personal moral reservations about the death penalty. There is no basis in the record for concluding that the asserted justification was merely a pretext for racial discrimination.

### 2. Appellant's *J.E.B.* challenge lacks merit.

In addition to objecting under *Batson*, Appellant also objects under *J.E.B.*, claiming that the State struck female venirepersons based on their gender. Appellant points out that the State used 13 of its 15 strikes on women. The record reflects that there were more women than men on the panel, yet the jury was composed of only four women but eight men. Appellant has satisfied his *prima facie* case under *J.E.B.* As was the case with Appellant's *Batson* challenge, however, the State provided gender-neutral reasons for its peremptory strikes against the female venirepersons—each individual struck by the State expressed more concern, hesitation, or opposition to imposing the death penalty than those venirepersons the State chose not to strike. We, therefore, must again examine the record under the *Flowers* factors to determine whether the State's expressed reasons were pretextual such that the trial court was clearly erroneous in rejecting Appellant's *J.E.B.* challenge.

### a. The statistical evidence is concerning but does not alone prove purposeful discrimination.

The State's use of 13 of its 15 peremptory strikes on female venirepersons and the fact that only four women made it onto the jury despite the panel having more women than men does raise concerns. But as previously addressed, statistical evidence alone cannot prove purposeful discrimination. *Watkins*, 245 S.W.3d at 452. Therefore, we look to the

other *Flowers* factors to determine if these factors collectively demonstrate purposeful discrimination such that the trial judge's ruling in this case was clearly erroneous.

### b. There is no evidence of discriminatory disparate questioning.

The record provides no evidence that the female venirepersons were questioned differently than the males. The State's individual voir dire of every venireperson focused heavily on the person's thoughts, feelings, and opinions about the death penalty, life imprisonment, and mitigation factors. As was the case with our *Batson* analysis above, while the State asked more questions of some venirepersons than it did of others, any additional questioning was almost always because the venireperson (whether male or female) vacillated in his or her responses or expressed more hesitancy, concern, or internal conflict about his or her ability to impose the death penalty, either generally or under the facts of this case. Having reviewed the record on this point, any additional questioning of the State-stricken female venirepersons regarding their personal views on the death penalty constituted a justifiable attempt by the State to follow up on potentially unfavorable answers that had already been provided. Such disparate approaches to questioning do not, on this record, provide persuasive evidence of gender discrimination.

### c. Side-by-side comparisons of stricken and accepted venirepersons support the State's nondiscriminatory reason for its peremptory strikes.

Without engaging in an exhaustive comparative analysis of each prospective juror, the following points demonstrate that the State was, in fact, focused on death-penalty issues and struck most of the female venirepersons based on their responses indicating personal

reservations about that punishment option:

- Most of the State-stricken female venirepersons rated themselves a three or four on a scale of one-to-six when asked about their support for the death penalty;

- Most said they were generally opposed to the death penalty except in a few cases, or that they were neutral on the appropriateness of the death penalty;

- Nearly all disagreed that the death penalty "gives the criminal what they deserve;"

- Nearly all expressed some favorable views about the option of life without parole, the possibility of rehabilitation, religious redemption, and/or the fact that life without parole forces offenders to live with the consequences of their crimes;

- Nearly all agreed that life without parole could be an adequate punishment for capital murder;

- Some, but not all, emphasized a defendant's background and upbringing as relevant factors in assessing whether the death penalty versus life without parole was appropriate.

Comparatively speaking, the venirepersons—men and women—who were not struck by the State generally expressed more favorable views towards the death penalty and less favorable views towards the life-without-parole option and mitigating evidence than did the female venirepersons described above.

Appellant again points to Venirepersons 47, 68, and 80 as examples of male prospective jurors who also expressed serious moral reservations about the death penalty but were not ultimately struck by the State. But, as we have already noted above in our *Batson* analysis, these venirepersons were overall favorable for the State's preferred punishment (particularly given the facts of this case, which involved a strong case for guilt but also possibly significant mitigating evidence). Comparing these venirepersons to the female venirepersons struck by the State, there is no inference of purposeful gender

discrimination.

### d. The record supports the State's explanations for its strikes.

As mentioned, the State's broad explanation for its peremptory strike strategy was that it was "certainly focused almost single-handedly on the issue of the death penalty." Consistent with this strike strategy, the reason proffered by the State for striking the challenged female venirepersons was always that each of the stricken persons gave unfavorable responses regarding the ability to impose the death penalty either generally or in this case. The record supports the State's explanation.

### e. The other circumstance raised by Appellant fails to demonstrate purposeful discrimination.

Appellant makes one additional argument with respect to gender that he did not make with respect to race. He contends that the record disproves the State's assertion that the panel was disproportionately female. This assertion was made by the State at trial in response to Appellant's *J.E.B.* objection.

The record reflects that, excluding alternates, the panel of qualified venirepersons had nineteen men and twenty-three women. Thus, the panel was fifty-five percent female and forty-five percent male. Appellant argues that this "slight disproportion" in favor of females "cannot serve to explain the pattern" of the State's strikes—eighty-seven percent female, thirteen percent male. He also contends that this slight disproportion is inconsistent with the State's explanation that of the qualified venirepersons, there were vastly more female than male venirepersons. This inconsistency, he claims, demonstrates that the State's justifications were pretextual.

While we find that the State's assertion of disproportionality was slightly exaggerated, this has no bearing on the issue before us. The issue is whether the statistical data coupled with other evidence indicates purposeful discrimination. *See Watkins*, 245 S.W.3d at 452. As we have already explained above, we find no persuasive evidence of gender discrimination in the record. Therefore, this additional consideration does not present compelling evidence of purposeful gender discrimination. Taking each of the foregoing arguments into account, individually and cumulatively, we conclude that the trial judge did not clearly err to overrule Appellant's *J.E.B.* objection. Point of error one is overruled.

### B. Appellant failed to preserve point of error six; it is therefore overruled.

In point of error six, Appellant argues that the trial judge erred to grant the State's challenge for cause to Venireperson 83. In individual voir dire, Venireperson 83 stated that because of Appellant's youth,[10] she would be unable to answer the special issue in favor of a death sentence. The State challenged Venireperson 83 for cause, arguing, "[S]he's clearly indicated now to both the State and the Defense that she would not be able to consider the death penalty." After the State made its challenge, defense counsel stated, "I don't have any response, Your Honor." The trial judge sustained the State's challenge and excused the venireperson from further service.

On appeal, Appellant argues that Venireperson 83's inclination to assign dispositive

---

[10] At the time of trial, Appellant was twenty-four years old. The parties did not divulge Appellant's age to Venireperson 83. But Appellant was present in the courtroom for individual voir dire, so Venireperson 83 was able to see him.

mitigating weight to Appellant's youth did not make her removable for cause. However, Appellant did not present that argument to the trial judge. A claim that the trial court erred when it sustained a challenge for cause is subject to procedural default. *See Simpson v. State*, 119 S.W.3d 262, 267 (Tex. Crim. App. 2003) (rejecting similar claims because the defendant "failed to object when the trial court sustained the State's challenges for cause") (citing TEX. R. APP. P. 33.1). Because Appellant did not offer any contemporaneous argument against the trial court's ruling sustaining the State's challenge for cause, he cannot now complain that the trial judge's ruling was erroneous. *See id.* Point of error six is overruled.

### C. Appellant also failed to preserve points of error seven and eight; they are therefore overruled.

In points of error seven and eight, Appellant raises an Eighth Amendment and due process challenge based on the State's comments during voir dire that arguably suggested the victim's family wanted Appellant to receive a death sentence. *See Booth v. Maryland*, 482 U.S. 496, 508–09 (1987) (providing that under the Eighth Amendment, in a death-penalty case, evidence of the victim's family's preferred sentence is inadmissible; allowing such "emotionally charged opinions as to what conclusions the jury should draw from the evidence" violates the Constitution), *overruled on other grounds by Payne v. Tennessee*, 501 U.S. 808 (1991); *Simpson*, 119 S.W.3d at 272 (citing *Payne*, 501 U.S. at 830 n.2) ("The wishes of the victim's family members as to the defendant's fate fall beyond the parameters of victim-impact evidence and are not admissible."); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987) (noting that prosecutorial misconduct, in the form of improper questioning,

violates due process if it denies the defendant a fair trial). Appellant identifies six venirepersons (Venirepersons 14, 31, 37, 80, 81, 85) who heard these allegedly improper comments. An example of such comments occurred during the individual voir dire of Venireperson 14 in which the prosecutor stated: "[T]he Defense wants to make sure they have a juror that can consider life without parole, and certainly the Prosecution and *the victim's family wants to make sure that we have a juror that can also consider the death penalty*." (emphasis added).

A claim that a prosecutor made improper comments in voir dire is subject to procedural default. *See, e.g., Draughon v. State*, 831 S.W.2d 331, 336–37 (Tex. Crim. App. 1992); *see also Simpson*, 119 S.W.3d at 272 n.9 (acknowledging that a claim relating to improper evidence of a victim's family's wishes pertaining to death sentence is forfeitable). In this case, Appellant did not contemporaneously object when the State made any of the comments at issue. Appellant contends that he preserved this point of error for appellate review when, at trial, he "unsuccessfully objected to the State's reference to the 'victim' during voir dire on the ground that it violated [his] presumption of innocence." This objection, however, does not match the complaint Appellant now raises on appeal. On the contrary, that objection is substantively different from the argument Appellant now advances. *See* Tex. R. App. P. 33.1.

Alternatively, Appellant argues that complaints about these kinds of comments (i.e., those informing prospective jurors of the victim's family's opinions about the appropriate punishment in a death-penalty case) should be immune from ordinary principles of procedural default. We disagree because this type of complaint could have been cured by

a timely objection and instruction from the trial judge if the trial court had been placed on notice of the issue. *See Draughon*, 831 S.W.2d at 336–37 ("Here, a curative instruction could easily have dissipated any potential for prejudice visited upon Appellant."). Because Appellant did not contemporaneously object when the State made the comments at issue in this point of error, thereby depriving the trial court of an opportunity to cure any such error, he failed to preserve his complaint. Points of error seven and eight are overruled.

**D.      Point of error nine is overruled because Appellant has not shown that his counsel's failure to object to the State's voir dire comments affected the outcome of the proceeding.**

In point of error nine, Appellant complains that trial counsel's failure to object to the State's improper voir dire comments (alleged in points of error seven and eight) deprived him of his Sixth Amendment right to the effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984). A claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687. To satisfy the second prong, the defendant must establish a reasonable probability that, but for his lawyer's errors, the result of the proceeding would have been different. *Id.* at 694. In this context, a reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

Even assuming that trial counsel's performance was deficient here, Appellant has not shown a reasonable probability that, but for counsel's failure to object to the comments at issue, the punishment phase would have ended differently. *See id.* Though the State's allegedly improper comment regarding the family's preferred punishment occurred across the voir dire of six of the jurors who were ultimately selected, each of these six venirepersons heard the comment only once or twice. No such statement was mentioned during the trial itself. Further, the court duly instructed the jury that "statements made by the lawyers" were not evidence for them to weigh in their punishment-phase deliberations. Finally, considering the facts of the underlying murder and the totality of the evidence adduced at trial and during the punishment phase, our confidence in the outcome of this trial is not undermined by the comments at issue here. Point of error nine is overruled.

## II. Claims of Jury-Charge Error (Points of Error Ten and Eleven)

In points of error ten and eleven, Appellant claims that the trial court erred by refusing to give a lesser-included-offense instruction on non-capital murder. Specifically, in point of error ten, he claims that this failure violated Texas Code of Criminal Procedure Article 37.08. In point of error eleven, he claims this failure violated the Eighth Amendment's prohibition on cruel and unusual punishments and the Fourteenth Amendment's guarantee of due process.

### A. We overrule point of error ten because the trial court did not violate Code of Criminal Procedure Article 37.08 by refusing to include a lesser-included-offense instruction for non-capital murder.

In point of error ten, Appellant argues that the trial judge's refusal of a lesser-

included-offense instruction on regular, non-capital murder under Penal Code Section 19.02 violated Article 37.08. *See* ART. 37.08 ("In a prosecution for an offense with lesser included offenses, the jury may find the defendant not guilty of the greater offense, but guilty of any lesser included offense."); *see also* TEX. PENAL CODE § 19.02 (defining non-capital murder).

At trial, the jury learned that Appellant had told investigators that, in the years leading up to Johnson's death, he and Johnson "had a relationship." The relationship Appellant described to investigators was sexual, consensual, and secretive. Appellant further claimed that he and Johnson were having consensual sex shortly before she died. Appellant explained that that was why he and Johnson were in the dry-goods commissary in the first place—they had both snuck away from their respective posts to have sex.

With this evidence in mind, at the charge conference, Appellant's counsel asked for a lesser-included-offense instruction on "regular old 19.02 murder" (i.e., non-capital murder under Penal Code Section 19.02). Counsel argued that the jury could rationally find that Johnson, having snuck off in the middle of her shift to have sex with an inmate, was not "employed in the operation of the penal institution" when she died, which was the aggravating factor required to support a finding of capital murder as alleged. *See* TEX. PENAL CODE § 19.03(a)(5)(A) (providing that a person commits capital murder if "the person, while incarcerated in a penal institution, murders another who is employed in the operation of the penal institution"). Counsel explained that the word "employed," as used in Section 19.03(a)(5)(A), is commonly used outside the context of the employer/employee relationship to mean simply, "to be used for a purpose." So, if Johnson was acting outside

the purpose for which the prison was "employing" her (in the sense of using her services as a correctional officer) at the time of her death, she was not "employed in the operation of the penal institution" at that time. Counsel analogized Johnson's murder to the murder of a peace officer who was not "acting in the lawful discharge of an official duty" when he or she was killed. *Cf.* TEX. PENAL CODE § 19.03(a)(1).

The trial judge denied counsel's request for the instruction on non-capital murder under Section 19.02. However, based upon Appellant's statement to investigators that he did not intend to kill Johnson when he choked her, the trial judge charged the jury on the lesser-included offense of manslaughter.

In determining whether a defendant is entitled to a lesser-included-offense instruction, we conduct a two-pronged analysis. The first prong asks whether the requested lesser offense meets Article 37.09's definition of a "lesser included offense . . . of the offense charged." *See Hall v. State*, 158 S.W.3d 470, 473 (Tex. Crim. App. 2005). In this case, it is uncontested that non-capital murder is, as a matter of law, a lesser-included offense of capital murder under Article 37.09. Therefore, our analysis focuses solely on the second prong, which asks "whether the evidence admitted at trial would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense." *George v. State*, 634 S.W.3d 929, 937 (Tex. Crim. App. 2021) (internal quotation marks omitted) (quoting *Solomon v. State*, 49 S.W.3d 356, 369 (Tex. Crim. App. 2001)).

The second prong is satisfied if there is even a scintilla of evidence, from any source, refuting or negating the aggravating element of the greater offense. *See id.* (quoting *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011)); *Robertson v. State*, 871 S.W.2d

701, 706 (Tex. Crim. App. 1993). This is true even if the evidence supporting the lesser offense is weak, impeached, or contradicted. *Cavazos v. State*, 382 S.W.3d 377, 383 (Tex. Crim. App. 2012). However, a defendant is not entitled to a lesser-included-offense instruction if the evidence would support only an illogical or irrational finding that he was guilty only of the lesser offense. *George*, 634 S.W.3d at 937.

Applying these principles here, we must decide whether there is any evidence in the record that, if credited, could rationally establish that Johnson was *not* "employed in the operation of [a] penal institution" at the time of her death. *Id.*; *see* TEX. PENAL CODE § 19.03(a)(5)(A). Our resolution of this issue depends upon the meaning of the statutory phrase, "employed in the operation of [a] penal institution." *Id.* In his brief, Appellant argues that this language can reasonably be understood to exclude a person who, though on the institution's payroll, is "actively and voluntarily engaged in activities that undermine the functions of the [penal] institution" at the time of the offense. Specifically, Appellant contends that "where there is evidence that the decedent was a correctional officer engaging in illegal sexual conduct with a prisoner at the time of death, the jury could reasonably conclude that the person was not during that time 'employed in the operation of a penal institution[.]'"

Appellant's proposed interpretation of the statute is not a reasonable one. Although the word "employ" has multiple possible meanings, the only definition that makes sense

given the statutory context[11] is "to provide with a job that pays wages or salary."[12] The complete statutory phrase at issue references the employment of a person (as opposed to a thing or object) and a place where that person is "employed" (a "penal institution"). Thus, given this context, the most natural understanding of the statutory phrase, "employed in the operation of the penal institution," is that it applies to an individual who has been hired or contracted to work in some capacity at the penal institution. Under this interpretation, it is irrelevant what the murder victim is actually doing at the precise time of the murder, so long as the murderer is incarcerated and the victim is an individual who is "employed" (that is, has been hired to work) at the penal institution.

We further note, to the extent the statutory language is ambiguous, that the consequences of a particular construction may aid in our understanding. *Chiarini v. State*, 442 S.W.3d 318, 320 (Tex. Crim. App. 2014); TEX. GOV'T CODE § 311.023. If Appellant's interpretation were correct, the statute would make no distinction between a penal employee who is engaging in misconduct and one who is, for whatever reason, not actively carrying out the duties she was hired to do. This latter category might include, for instance, an employee who is on break, or one who has finished her shift and is getting ready to leave. Therefore, under Appellant's understanding of the statutory language, the murder of

---

[11] While we acknowledge that under civil law whether an "employee" was actually "employed" (i.e., actually engaged in his employment duties) at the time of a particular incident may raise issues as to an employer's liability for the incident, that is not the case under the language of the penal statute at issue.

[12] *See* Webster's New International Dictionary 743 (3d ed. 2002).

a penal institution employee who is not actively contributing to the "operation of the penal institution" at that moment (e.g., one who is on break, one who has finished her shift and is leaving) does not qualify as capital murder. It is highly unlikely that the Legislature would have reasonably intended to exclude such scenarios from the statute's coverage.

Further, had the Legislature intended to convey some sense of "actively carrying out the duties of a penal institution employee" in Section 19.03(a)(5)(A), it could have used language more closely resembling that of Penal Code Section 19.03(a)(1). That provision makes it a capital offense for a person to murder a peace officer or fireman "who is acting in the lawful discharge of an official duty and who the person knows is a peace officer or fireman." *See* TEX. PENAL CODE § 19.03(a)(1). That kind of "lawful discharge of an official duty" language is conspicuously absent from Penal Code Section 19.03(a)(5)(A). We must presume that its absence represents an intentional legislative act. *Cf. Yazdchi v. State*, 428 S.W.3d 831, 837 (Tex. Crim. App. 2014) ("We . . . presume that every word in a statute has been used for a purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible") (internal quotation marks omitted). Accordingly, we conclude that if a person is otherwise "employed in the operation of the penal institution," in the sense that she has been hired to work at the penal institution, she does not lose that status whenever she is at work but is not actively carrying out the duties of her employment. Neither does she lose that status when she is engaged in acts of misconduct at work. *Compare* TEX. PENAL CODE § 19.03(a)(1) ("*lawful* discharge of an official duty") (emphasis added), *with id.* § 19.03(a)(5)(A) ("employed in the operation of the penal institution").

It follows that, even assuming for the sake of argument that the victim in this case was not carrying out any official duties and was engaging in misconduct when she died, she was still "employed in the operation of the penal institution" at that time. There is no evidence, not even a scintilla, to support the contrary conclusion. Convicting Appellant of murder, but not capital murder, under these circumstances would represent an "illogical or irrational" verdict. *See George*, 634 S.W.3d at 937. Therefore, on these facts, murder was not a valid, rational alternative to capital murder, and the trial court did not err in denying Appellant's request for such a lesser-included-offense instruction. Point of error ten is overruled.

**B.      We overrule point of error eleven because the trial court did not violate the Constitution's Eighth and Fourteenth Amendments by refusing to include in the jury charge a lesser-included-offense instruction for non-capital murder.**

In point of error eleven, Appellant argues that the trial judge's denial of his requested lesser-included-offense instruction also violated the Eighth Amendment's prohibition on cruel and unusual punishments and the Fourteenth Amendment's guarantee of due process. In support of this argument, Appellant cites the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980).

Assuming without deciding that Appellant preserved error on this claim,[13] the claim

---

[13] In his briefing of this point of error, Appellant does not cite to a portion of the record showing that, at trial, he invoked the Eighth Amendment or due process in support of his request for a lesser-included instruction on non-capital murder. The record shows that, when Appellant made his request, he filed with the trial clerk a written "proposed addition to the jury charge." The record further shows that, when the trial judge denied Appellant's request, the trial judge pulled Appellant's written proposal from the trial clerk's file, marked it as "Defendant's Appellate Exhibit No. 1," and directed the court reporter to "make [it] a part of the appellate record." If this

(Continued . . .)

lacks merit. *Beck* involved a constitutional violation in a trial where the jury "was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and . . . the evidence would have supported such a verdict." *Id.* at 627. As we have already established, the evidence in this case would not have rationally supported a verdict of guilty as to murder and not guilty as to capital murder. *Cf. Adanandus v. State*, 866 S.W.2d 210, 232 n.23 (Tex. Crim. App. 1993) (overruling a *Beck* claim because there was "no evidence . . . that would permit a jury rationally to find that appellant was guilty only of" his proposed lesser-included offenses).

Further, the "fundamental concern in *Beck* was that a jury that was convinced that the defendant had committed some crime but was not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all." *Schad v. Arizona*, 501 U.S. 624, 646 (1991) (partial plurality op.). Such a concern is not present here. Appellant received a lesser-included-offense instruction on manslaughter. Therefore, his jury "was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." *Id.* at 647. This "suffice[s] to ensure the verdict's reliability." *Id.* at 648. Point of error eleven is overruled.

## III.    Claims of Trial Court Error During Punishment Phase (Points of Error Twelve, Thirteen, Sixteen, and Seventeen)

---

document was made part of the appellate record in this case, we have been unable to locate it. It is possible that Appellant's written filing expressly invoked the Eighth Amendment and/or due process in support of his proposed lesser included instruction. In any event, our resolution of this point of error does not depend upon whether that is so.

In points of error twelve, thirteen, sixteen, and seventeen, Appellant alleges various errors by the trial court that occurred during the punishment phase of the trial. In points of error twelve and thirteen, Appellant claims that the trial court erred under Texas law and the United States Constitution's Due Process Clause by admitting into evidence a written statement by Appellant from his prior sexual assault case, which he claims was involuntarily given. In points of error sixteen and seventeen, Appellant alleges that the trial court erred by failing to question jurors as to whether they saw him outside the courtroom wearing shackles.

**A.     We overrule points of error twelve and thirteen because any error by the trial court in admitting Appellant's written statement into evidence was harmless beyond a reasonable doubt.**

Points of error twelve and thirteen concern a written statement that Appellant gave in connection with his 2011 conviction for aggravated sexual assault of a child. In these points of error, Appellant argues that the trial judge violated due process and Code of Criminal Procedure Articles 38.21 and 38.22 by admitting the statement into evidence at the punishment phase of Appellant's capital murder trial.

The underlying sexual assault was alleged to have occurred in October 2010, when Appellant was sixteen years old and the victim, T.O., was ten years old. For this offense, Appellant was certified to stand trial as an adult. In the district court, rather than going to trial, Appellant agreed to plead guilty to the offense in exchange for a twenty-five-year sentence. *See* TEX. PENAL CODE § 22.021(f)(2).

During the punishment phase of Appellant's capital murder trial, the State introduced the prior judgment of conviction, as well as adducing evidence of the sexual

assault itself. T.O. testified. She recounted that, on October 5, 2010, when she was ten years old, she was walking home from school when a "boy" whom she did not recognize approached her and asked for directions. After she gave the boy directions, T.O. turned to walk away. Moments later, the boy came up behind her, put her in a choke hold, and took her to a wooded area. The boy threw her on the ground, made her perform oral sex on him, and then forcibly raped her. When she fought back, he beat her. Eventually, the boy left, and T.O. made her way to safety.

Photographs of T.O. taken shortly after the ordeal corroborated that it was a violent and bloody attack. The officer who responded to the sexual assault dispatch testified that T.O.'s was one of the worst cases of sexual assault she had ever investigated. The case stood out to the officer because, in her experience, "stranger rape" cases—those in which "[t]he victim does not know the perpetrator"—are rare. She described the police department's search for T.O.'s assailant as an "all hands on deck" situation. Within two days, investigators came to suspect Appellant because he matched T.O.'s description of her assailant and was spotted near the crime scene.

After this testimony, and outside the jury's presence, the State developed evidence of police investigators' efforts to question Appellant about his involvement in T.O.'s sexual assault. The investigators took Appellant to a juvenile processing facility, where they Mirandized him and interviewed him for approximately two hours. At first, Appellant denied any involvement. Then, when one of the investigators asked Appellant whether he knew "how DNA worked," Appellant's statement changed. Appellant admitted that he had sex with T.O. but claimed that the sex was consensual. He explained that T.O. had lied

about her age, and the two of them got into a fight after they had sex, culminating in Appellant throwing her to the ground and leaving. This oral statement was audio recorded.

After Appellant gave this oral statement, the investigators brought in a magistrate to admonish Appellant so that he could provide a written statement. *See* TEX. FAM. CODE § 51.095(a)(1)(A). The magistrate gave Appellant the admonishments mandated by the Family Code for written statements by juvenile suspects. *See id.* Thereafter, Appellant reduced to writing the version of events he had just described to the investigators— consensual sex followed by a physical scuffle. The magistrate certified that Appellant understood his rights and was signing his written statement "of his own free will."

After eliciting this testimony outside the jury's presence, the State sought to introduce into evidence for punishment purposes both the oral and written statements. Appellant objected. He argued that the procedure the investigators used to admonish him before his oral statement did not comply with the Family Code, rendering that statement inadmissible. *See* TEX. FAM. CODE § 51.095(a)(5) (requiring that certain admonishments be given by a magistrate). As for the written statement, Appellant argued that it was involuntary because it was given only after he had "let the cat out of the bag" via the Family-Code-noncompliant (and thus inadmissible) oral statement. *See Griffin v. State*, 765 S.W.2d 422, 427 (Tex. Crim. App. 1989) (holding that the "cat out of the bag" theory of involuntariness, though perhaps of "limited value," may nevertheless be considered in the totality of circumstances informing the voluntariness issue); *cf. also Missouri v. Seibert*, 542 U.S. 600, 604 (2004) (holding unconstitutional a question-first-Mirandize-later interrogation practice). Ultimately, the trial judge excluded the oral statement but admitted

the written statement.

In its closing jury arguments, without objection, the State mentioned Appellant's written statement twice. First, in its initial closing argument, the State argued that Appellant's statement proved that he was unable or unwilling to "accept responsibility for what he does," which is a "major indicator of future danger." Second, in rebuttal, the State pointed out that the statement Appellant gave in connection with T.O.'s sexual assault was similar to the statement he gave in connection with the instant capital murder.

The due process clause of the Fourteenth Amendment prohibits the admission of an involuntary confession into evidence. *See, e.g.*, *Rogers v. Richmond*, 365 U.S. 534, 540 (1961). Similarly, under Texas law, an accused's statement may be used as evidence against him only if it was "freely and voluntarily made without compulsion or persuasion[.]" ART. 38.21; *see also* ART. 38.22, § 6 ("In all cases where a question is raised as to the voluntariness of a statement of an accused, the court must make an independent finding . . . as to whether the statement was made under voluntary conditions."). We review for an abuse of discretion a trial judge's decision to admit a defendant's statement over an involuntariness objection. *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).

In this case, we need not determine whether the trial judge abused his discretion in admitting Appellant's written statement into evidence because we conclude that any such error was harmless. *See Ex parte Fierro*, 934 S.W.2d 370, 374 (Tex. Crim. App. 1996) ("[T]he improper admission of an involuntary confession is 'trial' error, subject to a harmless error analysis.") (quoting *Fulminante v. Arizona*, 499 U.S. 279, 306–12 (1991)). In assessing Appellant's claim of constitutional error in point of error twelve, we apply

Rule of Appellate Procedure 44.2(a), which requires us to "reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). This is a more stringent standard than our harmlessness analysis under Texas statutory law and therefore resolves both points of error twelve and thirteen. *Guidry v. State*, 9 S.W.3d 133, 151 n.14 (Tex. Crim. App. 1999) (acknowledging that when a reviewing court finds the admission of evidence harmless under Rule 44.2(a), there is no need to conduct a separate harm analysis under Rule 44.2(b) because "subsection (a) establishes a more stringent standard than subsection (b)"). Harmlessness is "not determined solely on the basis of whether there was sufficient evidence, independent of the defendant's inadmissible statement, for a reasonable jury to reach the same conclusion which it had . . . with the statement." *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim. App. 2001). If there is a reasonable likelihood that the error materially affected the jury's deliberations, it was not harmless beyond a reasonable doubt. *Id.*

Applying this standard, any error by the trial court in admitting Appellant's written statement was harmless. First, the fact that Appellant was convicted of aggravated sexual assault of a child, and the testimony recounting the alarming circumstances of the sexual assault itself, were far more damaging to Appellant than any benefit the State derived from presenting Appellant's written statement. Whether viewed through the lens of future dangerousness or mitigation, evidence that Appellant attempted to excuse or justify his behavior in violently sexually assaulting a ten-year-old girl appears relatively insignificant next to evidence that Appellant *in fact* violently sexually assaulted a ten-year-old girl.

Second, there was other evidence in the record, apart from Appellant's written statement, through which the State could establish that Appellant had previously characterized his sexual assault of T.O. as a consensual encounter. A juvenile probation officer testified that Appellant had "portrayed himself as the victim" of his encounter with T.O. She noted that Appellant "showed no remorse" about the encounter, claimed that he was a "victim of circumstance," and said that the entire ordeal was a "misunderstanding." One of Appellant's fellow inmates testified that Appellant told him the encounter with T.O. "was a consensual relationship that went bad." Further, when the State was cross-examining one of Appellant's experts, the following colloquy occurred:

> Q. Right. Okay. Did you notice that—when you reviewed the statements [Appellant gave] as between the aggravated sexual assault and the capital murder, did you notice a similarity in those statements—
>
> A. I did.
>
> Q. —okay. And there's that pattern of, "I don't know anything. I don't know. I didn't do it," and then he's confronted with DNA and then what? What does he say about it? It was consensual, right?
>
> A. Yes.
>
> Q. He said that both in that case with [T.O.] and he said that with the case with Mari Ann Johnson, didn't he?
>
> A. Yeah. That's—that's pretty typical on sexual assault cases[.]

Appellant did not object to any of this evidence. Considered cumulatively, this evidence conveyed the gist of Appellant's written statement—that he and T.O. had a consensual sexual encounter that subsequently "went bad."

The State did mention Appellant's written statement in its closing arguments, which

can, in some circumstances, weigh against a finding of harmlessness. *See McCarthy*, 65 S.W.3d at 53–54. But here, the State's references to Appellant's written statement were relatively fleeting. In fact, in the appellate record they accounted for only about sixteen lines of the State's more than nine hundred lines of closing argument. More importantly, even if Appellant's written statement had been excluded, the State could still use other properly admitted evidence to make the same jury arguments that: (a) Appellant had displayed an inability or unwillingness to take responsibility for his prior conduct, and (b) Appellant's characterization of T.O.'s sexual assault as being a consensual encounter bore key similarities to his characterization of his relationship with the victim in this case and his explanation for how that relationship led to the instant capital murder. Therefore, these closing-argument references to Appellant's written statement do not tip the scale in our harmlessness analysis. Accordingly, any error that may have arisen from the trial court's admission of Appellant's written statement was harmless beyond a reasonable doubt. Points of error twelve and thirteen are overruled.

> B.     **We overrule point of error sixteen because Appellant was not entitled to a mid-trial inquiry regarding a vague accusation that two unidentified jurors "may" have seen Appellant in shackles.**

On the second day of the punishment phase, Appellant's counsel informed the trial judge that he had been "advised" that two unidentified jurors "may" have seen Appellant being transported in shackles from the courthouse to the jail van. Counsel noted:

> [W]henever Mr. Compton comes and goes to the courthouse, he is typically in a red jumpsuit. He is typically shackled with his hands around his wrists in a chain that I believe it connects it to, so that he can't really stand up straight. He's sort of hunched over and it's apparent that he's very—he's shackled very heavily.

Counsel's concern was that "if [the jurors] saw that—we've done great things to put Mr. Compton in street clothes to be here and if they saw that, it would somehow make an impression upon them that would impact their verdict in this case." He asked the trial judge "to talk to those jurors individually to ensure that what they've seen wouldn't impact their verdict in an improper way." Counsel did not identify the jurors with whom he wished the trial judge to speak.

The trial judge made a finding on the record that all the jurors in this case "were aware from the get-go . . . that [Appellant] was incarcerated and that this [trial] involved his alleged conduct while incarcerated with TDC." The judge recalled that the jurors had affirmed in voir dire that, even though Appellant was a prison inmate, "they could extend [him] his constitutional protections, including but not limited to his presumption of innocence." After some additional findings, the trial judge denied Appellant's request.

On appeal, Appellant does not allege that any jurors saw him in shackles inside the courtroom. *See, e.g.*, *Deck v. Missouri*, 544 U.S. 622, 633 (2005) (holding that courts cannot, consistent with due process, "routinely place defendants in shackles or other physical restraints visible to the jury in the penalty phase of a capital proceeding"). Rather, he complains that the trial judge denied him an opportunity to prove that certain jurors saw him in shackles *outside* the courtroom and to inquire whether what they saw would influence their decision-making. He draws an analogy to federal cases in which a defendant alleges that an improper outside influence was brought to bear on a juror. *See Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Remmer v. United States*, 347 U.S. 227, 229–30 (1954). In such cases, Appellant argues, the defendant generally enjoys a due process right to a

hearing where he can develop evidence of actual bias.

Appellant's claim lacks merit. First and foremost, Appellant's claim that two jurors briefly glimpsing him in shackles *outside* the courthouse amounts to an improper outside influence is highly questionable. *See, e.g., Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002) (holding defendant was not prejudiced where "a few jurors at most glimpsed [the defendant] in shackles in the hallway and as he was entering the courtroom;" the jury's "brief or inadvertent glimpse of a shackled defendant is not inherently or presumptively prejudicial"); *see also Hernandez v. State*, 805 S.W.2d 409, 415 (Tex. Crim. App. 1990) (mistrial unnecessary where jurors caught only a "momentary, inadvertent, fortuitous" glimpse of the defendant in shackles outside the courtroom). But even accepting that such facts could give rise to a finding of improper outside influence, none of the cases cited by Appellant here support his position that he was entitled to a *mid-trial* inquiry into this matter. Instead, Appellant's cited cases consistently hold that a defendant has a due process right to a *post-trial* hearing on the issue of improper outside influences. *See Phillips*, 455 U.S. at 221 (holding that the prosecution's failure to turn over information about a juror "requir[ed] a post-trial hearing on juror bias"); *Remmer*, 347 U.S. at 230 (ordering a post-trial hearing to determine whether "the incident complained of" prejudiced the defendant); *United States v. Jordan*, 958 F.3d 331, 336 (5th Cir. 2020) (concluding that on a motion for new trial, federal district courts may not deny a claim of improper jury influence without first holding a hearing). We also note that Appellant failed to ask the trial judge for a post-trial hearing on this issue. Appellant has not shown that federal due process required a mid-trial hearing as he suggests. *See Phillips*, 455 U.S. at 218 ("[I]f in the federal system a post-

trial hearing . . . is sufficient to decide allegations of juror partiality, the Due Process Clause of the Fourteenth Amendment cannot possibly require more of a state court system.").

Further, even assuming that due process might occasionally require a mid-trial inquiry into an allegation of outside influence under these or similar circumstances, Appellant did not apprise the trial judge of sufficient facts to trigger the need for such an inquiry. After initially informing the judge that some unnamed jurors "possibly" saw Appellant in shackles, trial counsel stated that he had been "advised" that the two unidentified jurors were "here" (presumably, at the courthouse) when Appellant was being transported to the jail van, and that these jurors "may have seen" Appellant in shackles. Appellant's own cited cases suggest that a hearing is warranted only in response to *specific allegations* of improper outside influence. *See, e.g., Jordan*, 958 F.3d at 337 (Federal district courts must hold a hearing "when faced with . . . credible allegations of prejudicial outside influence on the jury."). Without more information suggesting the need for further inquiry, the trial judge was not obligated to interrupt the trial proceedings to speak with the jurors. *See id.* at 336 (rejecting the notion that a federal district court is "obligated to conduct a full-blown evidentiary hearing every time an allegation of jury tampering is raised"). Point of error sixteen is overruled.

**C.**     **We overrule point of error seventeen because the mere presence of uniformed TDCJ officers in the courtroom during punishment closing arguments, without more, is not inherently prejudicial and does not violate the Constitution's Sixth and Fourteenth Amendments.**

In point of error seventeen, Appellant argues that the trial judge's failure to "adequately regulate the courtroom environment" during the punishment phase closing

arguments violated his constitutional right to a fair trial by an impartial jury under the Sixth and Fourteenth Amendments to the United States Constitution.

The day before punishment-phase closing arguments, Appellant's counsel asked the trial judge to order that any Texas Department of Criminal Justice (TDCJ) employees who planned on attending the proceedings must dress "in normal, regular attire rather than a uniform." In support of that request, counsel cited this Court's decision in *Howard v. State*, 941 S.W.2d 102, 118 (Tex. Crim. App. 1996) (op. on original submission), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535, 538 n.23 (Tex. Crim. App. 2014).

In *Howard*, the defendant was convicted of capital murder for murdering a peace officer. During the punishment phase closing arguments, over the defendant's objection, twenty uniformed peace officers were permitted to attend as spectators. *Id.* The officers ultimately comprised "roughly one-fifth" of the spectator gallery. *Id.* On appeal, the appellant claimed that the officers' presence in the gallery offended his Fourteenth Amendment right to a fair trial. *Id.* at 117. On original submission, this Court overruled that claim, holding that the record did not support a reasonable probability that an external influence interfered with the jury's verdict. *Id.* at 118.[14] But the Court acknowledged that, "[i]f the record [had] indicated some overt conduct or expression, or perhaps a higher ratio of police officers, or even perhaps some indication that the law-enforcement contingency

---

[14] Following our opinion on original submission, the Court later granted rehearing, re-examined its disposition of two unrelated points of error pertaining to jury selection, and ordered a new punishment trial. *Howard v. State*, 941 S.W.2d 102, 126 (Tex. Crim. App. 1996) (op. on reh'g). However, the Court did not withdraw its original opinion. Thus, our original analysis of Howard's improper-influence point of error remains valid.

gravitated toward the jury, then there might be some basis for appellant's argument." *Id.*

Trial counsel in this case specifically directed the trial judge's attention to this last passage from *Howard*. The trial judge, however, denied counsel's request. Counsel then asked for permission to videotape the courtroom during closing arguments so that she could make a record of how many uniformed officers were in the gallery. The trial judge also denied this request. Instead, he ruled that, should the need arise, counsel could make a "spoken record" outside the jury's presence as to the number of uniformed TDCJ employees in the gallery.

On the morning of closing jury arguments, Appellant's counsel apprised the trial judge that "over ninety percent of the gallery are TDCJ employees." The State countered that "approximately a fourth of the people in the courtroom at this time are in gray [TDCJ] uniform[s]," and that the rest of the spectators were dressed in such a way that their relationship to TDCJ was not on display. Defense counsel argued that it was "clear and apparent that those individuals are TDCJ employees." The trial judge settled this factual dispute on the record:

> THE COURT: All right. Let the record reflect . . . there's approximately between 12, no more than 18 gray uniforms in the courtroom. They are in the back half of the courtroom. Also, I have not counted everyone. Based upon years of experience in this courtroom there are approximately ninety-five plus people here in the courtroom . . . the remainder of which are all wearing professional business attire or attire that is appropriate for these proceedings.

Defense counsel made no further requests of the trial judge relating to this issue.

In its final summation, the State made the following argument:

> And then there's some other people we really haven't talked much about. These people just kind of blend in. Maybe you've seen them at the grocery

store, counting the last dime at the end of the month to pay for those groceries waiting for that next paycheck. They just kind of blend in because they wear gray. It's not a job to get rich doing but it's a job that matters. It's a job that matters to us because what they do is they keep us safe. . . . I'm hoping that [today] is going to be the day that justice is delivered, that Jones County, this jury, to those folks in gray you'll [keep them safe].

Appellant did not object to this argument.

The Sixth and Fourteenth Amendments of the United State Constitution guarantee the right to be tried by impartial, indifferent jurors whose verdict is based solely upon the evidence developed at trial. *See Howard*, 941 S.W.2d at 117 (citing *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986)). For an appellant to prevail on a claim that an improper external influence on the jury impeded this right, he must show that the influence caused either actual prejudice or was inherently prejudicial. *Id.* In this case, Appellant argues only that the organized presence of uniformed TDCJ employees in the spectator gallery during closing arguments was inherently prejudicial.

To evaluate inherent prejudice in this context, we look to whether "'an unacceptable risk is presented of impermissible factors coming into play.'" *Id.* (quoting *Holbrook*, 475 U.S. at 570). Alternatively, the test is whether there is a "reasonable probability" that the spectator conduct or expression at issue "interfered with the jury's verdict." *Id.* (citing *Landry v. State*, 706 S.W.2d 105, 112 (Tex. Crim. App. 1985)). These alternative ways of describing the relevant inquiry are "essentially interchangeable." *Id.* In either case, a finding of inherent prejudice is rare and "'is reserved for extreme situations.'" *Id.* (quoting *Bundy v. Dugger*, 850 F.2d 1402, 1424 (11th Cir. 1988)).

In this case, as in *Howard*, Appellant does not allege that the uniformed TDCJ

employees actively conducted themselves in a manner which prejudiced his opportunity to receive a fair trial. Rather, he argues that inherent prejudice arose from the confluence of six factors, namely: (1) Appellant was charged with murdering a correctional officer; (2) the jury had already found him guilty of that offense and was about to decide whether he would live or die; (3), by the State's estimate, up to one-fourth of the courtroom was occupied by uniformed TDCJ employees; (4) the TDCJ employees at issue were representing the State by wearing their uniforms, notwithstanding that they were not performing any official duties in the courtroom; (5) the uniforms were intended to send a message about what TDCJ officers believed the appropriate sentence should be; and (6) the State alluded to the TDCJ employees in attendance in its final summation.

Looking to the totality of the circumstances, the mere presence of these uniformed employees in the courtroom, without more, was not inherently prejudicial. *See id.* at 118. With respect to the factors cited by Appellant, his second and fourth factors are present any time uniformed officers attend a capital sentencing proceeding as observers. We decline to create what would effectively amount to a presumption of inherent prejudice anytime a group of uniformed officers appear at a sentencing hearing. Appellant's fifth factor is speculative, in that it presumes to know the officers' intent in appearing in the courtroom. Moreover, the officers' intent is immaterial in the absence of some overt display, beyond mere presence, that might have signaled that intent to the jury. With respect to his sixth factor, although the State referred to the "folks in gray" in its final summation, the record does not corroborate Appellant's assertion that the State was directly referring to the gray-uniform-clad TDCJ employees in the courtroom at that time. Rather, it appears that the

State was referring more generally to TDCJ employees at large. But even accepting Appellant's characterization of the State's argument, this factor does not weigh in favor of finding inherent prejudice here. As we indicated in *Howard*, nothing about this circumstance demonstrates a reasonable probability of improper interference with the jury's verdict. *See id.* (rejecting contention that State's plea for law enforcement coupled with references to the officers present in the courtroom was the "source of inherent prejudice").

That leaves only Appellant's first and third factors as potentially establishing inherent prejudice here: Namely, that Appellant was convicted of murdering a correctional officer and that uniformed TDCJ employees comprised up to one-fourth of the gallery. As Appellant himself concedes, those factors bear a striking similarity to the situation we found non-prejudicial in *Howard*. As in *Howard*, the employees in this case did not impede the trial proceedings, sat quietly in the back half of the courtroom, did not gesture or "gravitate" towards the jurors, and according to the trial judge's estimate, comprised somewhere between thirteen and nineteen percent of the spectator gallery. Their mere presence is alone insufficient to establish a reasonable probability of improper interference with the jury's verdict. *Id.* at 118 ("[T]his Court cannot hold that the mute and distant presence of twenty peace officers—comprising roughly one-fifth of the spectator gallery—is prejudicial, per se, without some other indication of prejudice."). Even if, as Appellant alleges, the employees were seated together in the gallery, we conclude on these facts that there was neither an "unacceptable risk" of impermissible factors coming into play, nor a "reasonable probability that an external influence interfered with the jury's verdict." *Id.*

Point of error seventeen is overruled.

## IV. Punishment-Phase Jury Argument Claims (Points of Error Two, Three, Four, Five, Fourteen and Fifteen)

In points of error two, three, four, five, fourteen and fifteen, Appellant accuses the State of making improper jury arguments. Points of error two, three, four, and five concern a remark the State made in its punishment-phase closing arguments, in which the State accused Appellant of "playing the race card." In point of error fourteen, Appellant argues that the State impermissibly snuck into its closing argument excluded evidence. In point of error fifteen, Appellant argues that his defense counsel was ineffective for failing to object to the State's impermissible argument.

### A. Points of error two through five are overruled because they are not preserved for appeal; trial counsel failed to object to the State's closing arguments at issue.

In these points of error, Appellant alleges that the State's closing arguments included a remark that encouraged the jury to sentence him more harshly based on his race, in violation of his constitutional rights to equal protection and due process, the Eighth Amendment, the constitutional prohibition on prosecutorial misconduct, and Article 37.071, Section 2(a)(2).

Specifically, in one of its punishment phase closing arguments, the State argued:

Over and over and over we see this same M.O. played out by the Defendant from the time he was in junior high to now. He gets in trouble, he gets caught, he blames others. He lies and lies until he's cornered. He deflects responsibility. He claims he is the victim. And he gets really mad at those that are calling him out on those lies and those behaviors, and *when that doesn't work he starts playing the race card. "You're just picking on me because I'm black."*

Trial counsel did not object to this argument. Instead, she met it with her own closing argument:

> The State told you and will continue to tell you that the—they don't care about the childhood of Dillion Compton. That they don't care how traumatizing it was. That he pulled the race card and I find that appalling. Based on the evidence that you heard here Dillion Compton never pulled the race card. But race caused trauma to him . . . .
>
> [* * *]
>
> The evidence in this case is uncontradicted about childhood trauma and the evidence in this [case] is uncontradicted that Dillion Compton isn't pulling the race card when we talk about trauma and I am appalled at that as well that the words even came out of anyone's mouth that he's pulling the race card. Give me a break.

This response was consistent with two recurring themes of Appellant's closing arguments: (1) the State was putting words in Appellant's mouth; and (2) the State was inviting the jury to overlook the trauma Appellant experienced as a child.

On appeal, Appellant claims that the State's closing-argument remark about "playing the race card," was a constitutionally-impermissible racially-biased prosecutorial argument. *See McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987) (recognizing that the Constitution prohibits racially-biased prosecutorial arguments and that prosecutorial discretion cannot be exercised on the basis of race). Even assuming *arguendo* that the State's remark could be characterized as such, Appellant failed to contemporaneously object to the State's argument. He, therefore, failed to preserve error and has forfeited this claim. *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (concluding that a defendant may not complain on appeal that jury argument was improper if he did not object at trial); *Banda v. State*, 890 S.W.2d 42, 61 (Tex. Crim. App. 1994) (overruling claim that

prosecutor's closing argument violated the Eighth and Fourteenth Amendments because the appellant failed to object).

Appellant, however, makes four arguments as to why we should hold that these claims were not procedurally defaulted by trial counsel's failure to object. First, Appellant argues that when the State "infuses race" into a criminal trial in violation of equal protection and due process, such a violation should be immune from ordinary rules of procedural default. *Cf. Pena-Rodriguez v. Colorado*, 580 U.S. 206, 225 (2017) ("A constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts."). We disagree with Appellant's characterization of the State's argument as "infusing" the subject of race into the trial. On the contrary, Appellant himself raised the issue of race by presenting evidence suggesting that he had been the victim of racial abuse and that such abuse (particularly by his white family members) was a damaging influence in his life that constituted relevant mitigating evidence. Thus, it cannot fairly be said that race (or perhaps, more accurately, the topic of racism) would not have been an issue in the case but for the State's argument. Further, regardless of the appropriateness of the State's argument, it was a far cry from suggesting that Appellant was more likely to be a future danger, or more deserving of a death sentence, *because of* his race. *See, e.g., Buck v. Davis*, 580 U.S. 100, 119 (2017) (noting that "[i]t would be patently unconstitutional for a State to argue that a defendant is liable to be a future danger because of his race") (citing *Zant v. Stephens*, 462 U.S. 862, 885 (1983) (identifying race among factors that are "constitutionally impermissible or totally irrelevant to the

sentencing process")). In contrast to that type of plainly impermissible argument, the State's argument here was that Appellant refused to take responsibility for his actions and instead blamed other people's racism for his problems (in the sense that racism had led them to unfairly or unjustly accuse him of wrongdoing). Thus, the State's argument did not involve overt or even implicit invitations to sentence Appellant more harshly *because of* his race.

Second, Appellant argues that this Court "has held that individualized sentencing claims under the Eighth Amendment are not forfeited by failing to object at trial." In support of that assertion, he cites this Court's decision in *Garza v. State*, 435 S.W.3d 258, 262 (Tex. Crim. App. 2014). *Garza* held that a claim by a juvenile criminal defendant that he was improperly subjected to a mandatory life-without-parole sentence in violation of the Eighth Amendment was not subject to ordinary notions of procedural default, such that that claim was not forfeited through a lack of objection in the trial court. *Id.*; *see also Miller v. Alabama,* 567 U.S. 460, 465 (2012) (holding that mandatory life imprisonment without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on cruel and unusual punishments). Our analysis in *Garza* makes clear that it was directed at the particular type of claim at issue there and does not broadly apply to all Eighth Amendment "individualized sentencing" claims, as Appellant suggests. *Garza,* 435 S.W.3d at 262 (holding that "substantive status-based or individualized-sentencing claims under the Eighth Amendment *and embraced by Miller* [*v. Alabama*] are not forfeited by inaction)" (emphasis added). Further, even were we to assume that *Garza*'s holding applies to other types of individualized sentencing claims, Appellant's complaint

here is not such a claim. Nothing about the State's argument suggested that Appellant was deprived of an individualized sentencing determination based on the facts of the offense and his personal background. Nor was he improperly subjected to a punishment the State lacked the power to impose based on his status or personal characteristics. Thus, his reliance on *Garza* for this proposition is inapposite.

Third, Appellant contends that jury arguments that are so improper that they rise to the level of "prosecutorial misconduct in violation of due process" should be reviewable on appeal even in the absence of a trial-level objection. In support, he cites our opinion in *Grado v. State*, 445 S.W.3d 736, 741 (Tex. Crim. App. 2014), in which we held that certain rights implicating "the integrity of judicial sentencing proceedings" are not subject to procedural default. But *Grado* also does not support Appellant's position here.

In *Grado*, the defendant's community supervision was revoked, and the trial court sentenced him to ten years' imprisonment. *Id.* at 737. The record reflected that the trial judge believed ten years was the mandatory minimum sentence, but in fact the mandatory minimum sentence was five years. *Id.* This court held that the right at issue there—the right to be sentenced by a judge who has "identif[ied] the correct statute under which a defendant is to be sentenced and the range of punishment it carries and to consider the entire range of punishment"—was not subject to procedural default. *Id.* at 741. But in this same breath, *Grado* described this right as "fundamentally different" from the kinds of rights that this Court has typically found to be forfeitable, "which by and large, have been evidentiary or procedurally based." *Id.* To give an example of a right that we regarded as "fundamentally different" from the right at issue in *Grado*, we cited our opinion in *Cockrell*

*v. State*, 933 S.W.2d at 89, in which we held that claims of improper jury argument are subject to procedural default. *See Grado*, 445 S.W.3d at 741 & n.29; *Cockrell*, 933 S.W.2d at 89 ("Before a defendant will be permitted to complain on appeal about an erroneous jury argument or that an instruction to disregard could not have cured an erroneous jury argument, he will have to show he objected and pursued his objection to an adverse ruling."). Thus, *Grado* reaffirmed that, if a defendant wishes to challenge a jury argument as unlawful, he must object to the argument to preserve his ability to complain about it on appeal. Appellant has not made any compelling argument as to why the State's argument in this case falls outside this principle.

Fourth, Appellant argues that this situation falls within the prohibition of Article 37.071, Section 2(a)(2), which provides that, "[E]vidence may not be offered by the state to establish that the race or ethnicity of the defendant makes it likely that the defendant will engage in future criminal conduct." He further contends that violations of this statute should be reviewable on appeal even in the absence of a trial-level objection. Appellant posits that, although Section 2(a)(2) specifically refers to "evidence," it implicitly prohibits jury arguments suggesting that the defendant's race or ethnicity is indicative of future dangerousness. In support, he cites our decision in *Proenza v. State*, 541 S.W.3d 786, 801 (Tex. Crim. App. 2017), in which we held that claims of improper *judicial* commentary under a different provision, Article 38.05, are not subject to forfeiture by inaction.

Appellant's arguments are again unavailing. First, Section 2(a)(2) is critically different from the statute at issue in *Proenza*. *Proenza* noted that Article 38.05 is both "(1)

couched in mandatory terms and (2) directed at the trial judge herself." *Id.* at 798.[15] Section 2(a)(2), in contrast, is not directed at the trial judge and thus does not clearly put "a duty on the trial court to act *sua sponte*." *Cf. id.* (holding that Article 38.05 puts "a duty on the trial court to act *sua sponte*—or rather, a duty to refrain *sua sponte* from a certain kind of action") (internal quotation marks and footnote omitted). Given this distinction, *Proenza* does not stand for the proposition that Section 2(a)(2) complaints are non-forfeitable.

Alternatively, even assuming *arguendo* that a complaint under Section 2(a)(2) may be non-forfeitable under some circumstances, and assuming that the statute would apply to jury argument and not just "evidence," the State's argument here still would not fall within the statute's coverage. As we have already suggested above, the substance of the State's argument did not urge that "the race or ethnicity of the defendant makes it likely that the defendant will engage in future criminal conduct." Instead, the State's argument was that rather than taking responsibility for his actions, Appellant blamed other people's racism for his problems. Thus, Appellant's claim under Section 2(a)(2) lacks merit. In view of the foregoing, points of error two, three, four, and five are overruled.

> **B.     Point of error fourteen is overruled because Appellant failed to object at trial to the State's closing-argument remark at issue, and point of error fifteen is overruled because counsel's failure to object did not amount to ineffective assistance.**

Points of error fourteen and fifteen both relate to the State's punishment-phase

---

[15] *See* ART. 38.05 ("In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.").

closing argument, wherein the prosecutor referenced an oral statement that Appellant made concerning T.O.'s sexual assault, which the trial judge had previously ruled inadmissible. Specifically, in closing, the State argued:

> You saw up on the screen and read and heard that eight-page piece of fiction that he wrote *where now all of a sudden* it's [T.O.'s] fault. *First, he didn't know nothing about nothing. But now, now that there's DNA, oh, now we're going to paint a picture* that that tiny little girl in the teddy bear T-shirt is the seductress.

(Emphasis added.) Appellant points out that his only T.O.-related statement admitted into evidence—his written statement—did not reflect any change in his version of events after the police brought up the topic of DNA. Only by listening to the recording of his oral statement, Appellant contends, would a fact finder learn that his version of events had changed after the police brought up the prospect of DNA testing.

In point of error fourteen, Appellant argues that this sort of "smuggling in" of excluded evidence was so outrageous that it "infected the trial with unfairness," thus depriving him of due process. *See Darden v. Wainwright*, 477 U.S. 168, 180–81 (1986). However, Appellant did not object to the State's argument at trial. Therefore, he failed to preserve error. *Cockrell*, 933 S.W.2d at 89; *Banda*, 890 S.W.2d at 61. Nevertheless, Appellant alleges that the State's argument was so improper that it rose to the level of a due process violation. He therefore asks us to hold that his claim is immune from procedural default. We decline to do so. *See* discussion of *Grado*, *supra* p. 68 ("[I]f a defendant wishes to challenge a jury argument as unlawful, he must object to the argument to preserve his ability to complain about it on appeal."). Point of error fourteen is overruled.

In point of error fifteen, Appellant argues that trial counsel was ineffective for

failing to object to the State's argument. *See Strickland*, 466 U.S. at 687. We disagree. As we noted in our analysis of points of error twelve and thirteen, the State's cross-examination of Appellant's expert, *see supra* p. 53, gave the State an evidentiary basis for arguing that the prospect of DNA testing had caused Appellant to change his account of his encounter with T.O. Therefore, the trial court would not have erred in overruling any facts-not-in-evidence objection defense counsel might have leveled against the State's argument, whether constitutional or non-constitutional in nature. Counsel was not ineffective for failing to make a meritless objection. *See, e.g.*, *Vaughn v. State*, 931 S.W.2d 564, 566 (Tex. Crim. App. 1996) ("[I]n order to argue successfully that her trial counsel's failure to object to the State's . . . argument amounted to ineffective assistance, appellant must show that the trial judge would have committed error in overruling such an objection."). Point of error fifteen is overruled.

## V. Catchall Due Process Claim Based on the State's Cumulative Misconduct (Point of Error Eighteen)

In Appellant's final point of error, he argues that the cumulative effect of the misconduct he attributed to the State in points of error four, eight, and fourteen deprived him of a "fundamentally fair sentencing trial." To review, in point of error four, Appellant accused the State of prosecutorial misconduct for its "playing the race card" argument. In point of error eight, Appellant argued that, in voir dire, the State implied that Johnson's family wanted Appellant to be sentenced to death. And in point of error fourteen, Appellant asserted that, in closing jury arguments, the State improperly alluded to an oral statement Appellant made in connection with his earlier sexual assault case, which the trial judge had

previously ruled inadmissible.

As we have already noted, Appellant did not contemporaneously object to any of these instances of alleged misconduct. Therefore, he has not preserved error, if any, separately or cumulatively. *See Cockrell*, 933 S.W.2d at 89; *Draughon*, 831 S.W.2d at 336–37; *Banda*, 890 S.W.2d at 61. Point of error eighteen is overruled.

## CONCLUSION

Considering Appellant's points of error separately and cumulatively, we find no reversible error. Therefore, we affirm the trial court's judgment of conviction and sentence of death.

Delivered: April 12, 2023
Publish